Filed 2/27/25  P. v. Padilla CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MICHAEL JAVIER PADILLA,<br><br>     Defendant and Appellant. | B336348<br><br>(Los Angeles County<br>Super. Ct. No. BA508347) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry Paul Fidler, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Michael Javier Padilla fatally stabbed a teenaged romantic rival. He admitted to inflicting 11 stab wounds on the unarmed victim, but claimed he acted in self-defense. The jury did not credit his defense and convicted him of first degree murder. (Pen. Code, § 187, subd. (a).)

Appellant challenges (1) the sufficiency of the evidence showing premeditation, (2) the exclusion of evidence about the victim, and (3) the admission of recorded threats appellant made to his girlfriend, an eyewitness to the crime. We conclude that the record supports a finding of premeditation, the trial court's evidentiary rulings were sound, and overwhelming evidence supports the verdict. We affirm.

## FACTS

The victim, 17-year-old student Jaime Castellanos, lived in the Maravilla housing project. He weighed 125 pounds and had no training in martial arts or boxing. His two tattoos bore the names of his father and aunt.

Castellanos and appellant did not know each other. However, they each knew Alicia Tello. Appellant and Tello, both 18, were in a dating relationship since 2019. Tello lived in Maravilla. Appellant lived 14 miles from Maravilla.

Appellant saw Tello daily, they often communicated by messaging, and he would sneak into her house at night to sleep with her. They hung out on the Maravilla playground, near the slide. They tattooed each other's initials on their ring fingers, and planned to marry.

Tello testified that appellant did not carry a knife or weapon for protection, nor did he have problems with or fear anyone at Maravilla. She initially claimed that he was not obsessed, controlling, jealous, or threatening with her. He never

showed up unexpectedly, without first telling her his plans. They shared passwords to their social media accounts. They had "location sharing" on their cell phones, so appellant always knew Tello's whereabouts.

Tello and appellant had a rift in their relationship in July 2022, when she discovered that he contacted a woman, who Tello believed was a former girlfriend.[1] He denied it when she confronted him. She then broke up with him. Appellant did not accept the breakup, insisted that they were still a couple, and called and messaged her.

Two days after her break-up with appellant, Tello messaged Castellanos on Instagram. They were friends in middle school, but had not spoken for years, though she knew he lived in Maravilla. Tello flirted with Castellanos and said she wanted to hang out with him. She was attracted to him. She denied it was "payback" for appellant's contact with another woman.

Tello reunited with appellant. He saw her messages to Castellanos and confronted her. Appellant testified that he was angered by the flirtatious messages because Tello seemed interested in Castellanos. It felt like Tello was cheating on him. He was surprised that she found someone else so fast.

Appellant also confronted Tello because she sent "flirty" messages to another young man. Tello said appellant was "mad" that she messaged other guys. He wanted to know if she had "hooked up" with Castellanos. He was "surprised," "upset" and tearful that she was talking to other young men. Appellant began to check Tello's Instagram page because he wanted to

---

[1] All dates listed in these facts refer to the year 2022.

3

know if she was still trying to cheat on him and meet up with Castellanos. He testified that he no longer trusted her.

Tello complained to a friend in July that appellant was " 'tracking me down' " using the telephone locator feature. Tello told her mother that she did not want to see appellant, but he would come and stay outside, stalking her. She described him as "very possessive."

After her confrontation with appellant, Tello used an Instagram account to talk to Castellanos, which she deleted when appellant discovered it and became upset. Tello then created a private account to continue messaging with Castellanos; appellant did not know about the account or have the password to it. Tello communicated with Castellanos continuously in July and August. They talked about hanging out and exchanged flirtatious compliments. Tello confirmed at trial that she "never told" Castellanos in her messages that she had a boyfriend, and "the topic of a boyfriend never came up."

Tello spent August 10 with appellant. After he left, she messaged him that she wanted to break up. She felt that "there was no trust in the relationship anymore." Appellant did not want to break up, and was angry.

After breaking up with appellant on the night of August 10, Tello changed the password to her primary Instagram account to prevent him from seeing it. However, she did not turn off the "share location" feature of her phone, so appellant could see where she was.

That night, Castellanos messaged Tello. He asked when they could "link," i.e., hang out together. They made plans to leave their homes when everyone was asleep and meet in the Maravilla playground at 1:00 a.m. At 1:00 a.m. on August 11,

4

Castellanos told his mother he was going outside to escape the heat in their apartment. At the same time, Tello left her home for the five-minute walk to the playground.

When Tello left her home, appellant messaged her, asking where she was. He phoned several times, but she did not answer because she was focused on Castellanos. She had made no plans to see appellant that night.

Tello met Castellanos at 1:05 a.m. on August 11, on the Maravilla playground. They had "a quick hug hello." She did not see a weapon on him or feel one when they hugged. They sat down near the playground slide and started to talk. Nothing romantic occurred, such as a kiss or holding hands.

Tello claimed at trial that she told Castellanos at their meeting that she had an "ex" who was unfaithful. Tello never mentioned this to detectives during interviews, though they specifically asked her if she told Castellanos anything about appellant, and she denied it. Instead, she told detectives that their conversation on the playground was "just catching up," discussing her kitten and school.

About 10 minutes after Tello met up with Castellanos, appellant unexpectedly appeared. Tello was surprised. She told detectives that appellant spoke her name and asked, " 'What are you doing here?' you know, like, in a mad way."

Castellanos stood and took two steps toward appellant, saying, " 'What's up,' " according to Tello. Tello explained that it was like Castellanos was saying, "I don't know" what is going on. This contradicted her testimony at the preliminary hearing, when she said that Castellanos uttered " 'What's up' " and advanced with a fighting attitude; appellant then shoved Castillanos. Tello did not tell detectives in her initial interview

5

that Castellanos moved toward appellant. At trial, Tello clarified that Castellanos was not in close proximity to appellant or in his "personal space."

Appellant was mad, and responded to Castellanos by saying, " 'What?' " Within seconds, appellant and Castellanos began fighting. Tello claimed she did not see who threw the first punch and was unsure if appellant struck Castellanos all over his body. She testified that she saw them trip over the playground slide. Tello got to her feet and grabbed appellant to stop the fight.

Tello admittedly never mentioned to detectives or at the preliminary hearing that the two tripped over a slide. Instead, she told detectives she was "trying to stop" appellant as soon as the fight broke out. She believed that appellant "was attacking" Castellanos.

Tello was unsure at trial if appellant was kneeling over Castellanos, but told detectives that appellant was on his knees while Castellanos was laying on the ground, on his back. She told detectives that the fight lasted "a minute or less" because she pulled appellant away. The combatants did not say anything to each other. Castellanos never uttered a threat to appellant. She denied hearing Castellanos cry out in pain.

Tello took appellant's arm and they left. She denied ever seeing a weapon. She did not realize that Castellanos was stabbed during the fight. She saw him get up and walk toward the basketball courts.

Tello and appellant walked to his vehicle. She claims she went voluntarily. She got in on the driver's side, which is not how she normally enters. She did not see any injuries on

appellant—no blood, bruising, scratches, or redness. Tello did not recall if she asked appellant why he was there.

After driving off with appellant, Tello told him she wanted to break up. He cried, said he loved her and never cheated on her. They did not discuss why she was on a playground at 1:00 a.m. with another guy. Tello told him everything was okay and that they would stay together because she still loved him. She initially denied at trial ever being afraid of appellant.

By contrast, Tello told detectives in her interview that she and appellant both discussed breaking up, after the altercation with Castellanos. Appellant seemed angry, "a normal reaction," in Tello's words. Appellant later dropped Tello off at her home.

Tello felt no responsibility for the fight. Though she was curious about how Castellanos was doing, she did not contact him to see if he was okay. At no point did appellant call 911 for help; Tello did not do so either because she thought "it was just a regular fight" and had no idea that Castellanos was stabbed.

At 5:00 a.m. on August 11, a resident called 911 to report a person laying on the Maravilla basketball court. Deputies found Castellanos with a pool of blood behind his head from a stab wound. His entrails were hanging outside of his body. More blood was in the playground, near a slide. A blood trail led from the body to the playground.

Castellanos had no weapon on him, only a cell phone in his pocket. A search of his phone led deputies to discover his communications with Tello. In the data results, Castellanos made no threats against anyone and had no contacts with appellant.

The Maravilla community has 200 surveillance cameras recording continuously. The jury was shown recorded footage. It

7

showed Castellanos at 1:00 a.m. on August 11, enroute to the playground, a one- to two-minute walk from his apartment. A few minutes later, a female could be seen walking to the playground area from a different side of the complex. Footage showed a suspect parking at the community center in a black pickup truck at 1:19 a.m., walking across the basketball court and continuing onto the playground at 1:21 a.m. The victim was recorded walking from the playground to the basketball court at 1:22 a.m. There, he collapsed, rolled on the ground for a minute or two, then stopped moving. He did not get up again. Footage showed the suspect and the female walking to the parking lot together at 1:24 a.m. and leaving in the truck.

As the truck turned into the parking lot, the driver extinguished the headlights. The driver "hurriedly" moved down a walkway, immediately heading to the part of the playground where Tello and the victim were. He appeared to be looking at a cell phone.

No altercation is visible. However, a detective testified that he watched a "lightened" copy of the surveillance recording, and it looked like "the defendant moved forward" toward Castellanos. Soon after, Castellanos walked 30 yards eastbound, with the male suspect behind him, and fell down. The suspect and female walked to the parking lot. The time span between the arrival of the black truck and its departure was "a couple of minutes."

Later on August 11, appellant came to Tello's home. During his visit, Tello saw helicopters over the Maravilla playground, watched the news, and learned that someone had been fatally stabbed. Tello had "a feeling" it was Castellanos. Tello became scared of appellant when she learned of Castellanos's death.

8

Tello did not approach deputies at the scene to tell them there was a fight that morning at the playground involving appellant and Castellanos. She did not confront appellant. She did not disclose the fight to friends who messaged her about Castellanos, "Because I didn't want them to know." She knew deputies were searching for a couple seen leaving the crime scene. Tello testified that she was silent because she was "processing" the incident. On August 16, sheriff's homicide detectives came for her. She was at her aunt's home "[f]or my safety" because she was involved in Castellanos's death. The next time Tello spoke to appellant, he was already in jail.

When detectives located Tello, she was uncooperative but conceded that she was the person in the surveillance recordings. They arrested Tello and her father, believing she set up the killing, and her father fit the description of the killer. After her arrest, Tello became cooperative. She admitted to being at the scene of the killing and identified appellant. Detectives recorded two interviews with her.

At appellant's request, Tello did a "factory reset" on her phone to erase all its data right after the fight with Castellanos. Tello did not ask appellant why she should delete everything— her contact information, social media accounts, text messages, photos, videos, browsing history, passwords, etc. Detectives secured a search warrant for Tello's Instagram account. At trial, Tello testified that nothing on her phone incriminated appellant. However, she admitted that the reset deleted appellant's message asking where she was shortly before he came to Maravilla.

Once detectives identified who was present at the scene of the homicide, they were able to determine that Tello was the person seen walking into the playground on the surveillance

9

recordings, where she encountered Castellanos. Messages between Castellanos and Tello corroborated their plans to meet at that location at that hour. Tello confirmed at trial that she is the person seen in videos walking to meet Castellanos, hugging him, sitting on a ledge, appellant's arrival at the playground, and her subsequent departure with appellant.

Based on information they gathered, detectives obtained a warrant to arrest appellant, who surrendered himself a week after the killing. He had no injuries, scratches, marks, or redness on his neck. The absence of any injuries led detectives to believe that appellant had not been in a fight. Appellant's black pickup truck was searched for a weapon or DNA.

A criminologist documented stab wounds in Castellanos's right shoulder and forearm, left shoulder and upper arm, head and neck, back, and stomach. Blood samples from his hands and clothing, and blood stains on the ground did not contain appellant's DNA.

The medical examiner testified that Castellanos had 11 "sharp force injuries" consistent with knifing that caused his death. An injury to his left chest penetrated at least three and a half inches into his lung. It was a fatal injury. A deep wound in the upper abdomen perforated Castellanos's stomach, bowel, and colon, causing his intestines to protrude. This was also fatal, absent prompt treatment. A wound to the back of his head ran eight inches, from the top of his head to the bottom of his neck. It was forceful, chipped his skull, and exposed neck vertebrae.

Castellanos had a wound over three inches deep to his left upper chest and other wounds (to his back, arms, and face) that were not immediately fatal. Some injuries were sustained defensively, suggesting that he tried to push away his attacker.

10

He had numerous abrasions; however, there was no sign of mutual combat because he had no injuries to his hands or knuckles.

The criminologist found no apparent bloodstains in appellant's truck, which was "very clean and possibly just detailed." However, a luminescent test showed areas where latent blood might have been present. Samples taken from the truck were "uninformative," meaning Castellanos's DNA could not be included or excluded, but leaned toward exclusion.

Tello testified that she spoke to appellant daily in jail, by phone and in person, including just before she testified. When their recorded jailhouse conversation was played in court, Tello broke down in tears and changed much of her prior testimony. She conceded that appellant's threat "to beat the fuck out of you when I get home" and "I'm gonna fucking destroy the fuck out of you" scared her; she feared him "actually hurting me." His statement, " 'That pussy is mine. You know me. You're mine' " reminded Tello that appellant is possessive and did not care if she said their relationship was over. He referred to her as his "wife." She found it threatening that appellant said, "I'm gonna be home real soon" to let her know "he was going to come back to me to try to hurt me."

Though appellant did not harm Tello during their relationship, her view of him changed; she became fearful because of what he did to Castellanos. She realized "[t]hat he could hurt me, too."

Appellant made sexual threats against Tello, and she feared he could carry them out. He said, "You better pray for your fucking life, your fucking insides," "you're gonna get fucking obliterated, dude. Best believe your ass is going to be fucking

laid out on the bed for weeks." Tello felt she "wouldn't be able to stop him" because he is stronger. When she protested that they were no longer a couple, he replied that he would be at her home, "first thing when I get out." He added, "That pussy better be fucking ready. And when I come back, I'm going to unleash the mother fucking beast." Appellant said, "You might just end up in the hospital after I'm done with you." Tello felt that hanging up would get him angrier and more threatening, then he would come to her home.

Appellant told Tello that if they were not together, he did not want her to be with anyone else. This was something he previously made clear to her in July 2022, when she wanted to break up because he was messaging another girl. During their relationship, appellant became angry and threatening if she did something he did not like.

Tello agreed that she left out facts harmful to appellant in her initial testimony because she was scared. She conceded that appellant was angry, not sad, when he discovered she was messaging Castellanos and wanted to know if she met up with him. When appellant arrived at the playground on August 11, he said, " 'Alicia, what the fuck are you doing here?' " and was "very, very angry." When Castellanos stood and said " 'what's up,' " appellant pushed him on the chest twice, causing Castellanos to step back both times.

Tello admitted that appellant made the first physical contact by pushing Castellanos, who was unable to push back. Tello tried to pull appellant away but he continued to go after Castellanos, who was moving away from appellant. Tello did not hear the sound of punches connecting.

Tello testified that when she and appellant walked to his truck after the attack, he looked "like he wanted to hurt me" and angrily asked why she was there. She was scared. Contrary to her prior testimony, she did not leave with appellant voluntarily. When she said she wanted to go home, he said "no, that I was going to go live with him," which scared her. He had his arm around her neck; she feared that he would hurt her. He would not let her go. She lied that they would continue their relationship, so that she could go home. She reset her phone when he demanded it because she was afraid.

On August 12, appellant's mother Gina contacted Tello, told her to pack a bag and meet her outside. Once Tello was in the car, Gina said they were going to meet appellant. Tello was too scared to ask questions. Gina's pleasant demeanor seemed "fake" to Tello. Gina instructed Tello to turn off her phone "so that they couldn't track" her, drove to a building an hour away, and made Tello promise not to tell anyone because Gina did not want to lose her job. They entered an apartment. Gina left Tello, then returned later with Tello's family, who had come to appellant's home looking for her. Tello was relieved and started crying. Her parents took her to her aunt's home, where she stayed until detectives came for her on August 16.

Tello testified that Gina's presence in the courtroom at trial impacted her testimony—she felt "pressured into not saying the full truth" because of the way Gina was looking at her. Tello never told anyone about Gina's involvement until trial because she was too scared. Though she took her oath seriously, appellant caused her to be "scared to tell the truth."

Appellant testified that he drove his black pickup truck to Maravilla on August 11 and arrived at 1:19 a.m., as seen in

13

surveillance recordings.  He testified that he went to see Tello "[t]o talk to her about our relationship" after having an unexpected argument on Instagram the night of August 10, in which Tello called him a liar and said she wanted to break up.

Appellant testified that he was "frustrated and confused." He did not want to break up because he needed Tello and wanted to be with her forever.  He denied writing her, " 'where are you?' " He checked her location on his phone and called her, but she did not respond.

Appellant denied driving to Maravilla with the intention of killing anyone with the switchblade knife in his vehicle.  He parked in the lot that is closest to the playground, not near Tello's home.  He started to walk away, then hurried back to the driver's side door, where the knife was in a compartment near the driver's seat.  He put the knife in his pocket.  Appellant initially said he sometimes carried the knife for protection when visiting Maravilla.  He later testified, however, that the knife never left his vehicle before August 11.[2]

Appellant agreed that he could be seen jogging toward the playground on the surveillance recording, though he denied being in a hurry.  He had his phone in his hand and was looking at it. He did not take the fastest or most direct route to Tello's home. In the playground, he heard Tello's voice, then saw her "[a]nd

---

[2] Appellant was asked, "When was the last time you had taken that knife out of that car before August 11, 2022?" He answered, "I don't think I've ever tooken [*sic*] it out the car."  The prosecutor said, "That knife never left your car. Right?" Appellant replied, "Correct" and agreed that it "stayed in [his] car at all times."

14

some guy" sitting next to each other.  They were eight feet from him, in a secluded area.

Appellant said, " 'Alicia, like, what the fuck are you doing here?' "  Castellanos stood, took two steps toward appellant, and said in an aggressive tone, " 'what's up,' " like he wanted to fight.  Appellant did not know who he was, and he was in appellant's personal space.  Appellant pushed him away.  Appellant did not remember if Castellanos looked confused.  Castellanos did not expose a gun or knife.

Appellant testified that Castellanos retreated after being pushed, then grabbed appellant by the neck in a chokehold.  Appellant claimed he saw a glare of light in Castellanos's hands, though admittedly he was never touched by a knife and could not say if it was a weapon.  Appellant took out his knife and "started poking" his assailant, who never released the chokehold the entire time that appellant was stabbing him.  Appellant clarified that "poking" means "stabbing him."  He demonstrated in court that he was hunched forward while stabbing backward over his shoulders.  He did not warn Castellanos to back off before he used the knife.

The two tripped over the playground slide.  They stopped fighting after falling over the slide.  Tello grabbed appellant and they walked away.  Appellant agreed that video recordings show that the interaction between him and Castellanos lasted 27 seconds.

Appellant claimed he was unaware whether he made actual contact with Castellanos's body while poking at him.  Castellanos uttered no threats during the altercation.  At trial, appellant conceded that he used his knife to stab Castellanos 11 times.  He was unsure how Castellanos was stabbed in the back of his head,

on his back, or in his lung or stomach. He denied seeing blood on Castellanos, on his own hands or clothes, or on his knife. He purposely stabbed at Castellanos but denied intent to kill him.

Appellant was uninjured, except for some cuts on his knees. He did not call 911 to get help for Castellanos. He instructed Tello to "wipe her phone" when they got into his truck, then testified she did it on her own, then agreed (again) that he told Tello to wipe her phone with a factory reset, then testified (again) that he did not tell her to do a factory reset. He went home, put the switchblade on his dresser, and went to bed. At some point, the knife disappeared; appellant does not know what happened to it. He also does not know what happened to the phone he had with him on August 11.

Later on August 11, he learned that Castellanos was dead while watching the news at Tello's home. He knew that detectives and other officers were on site nearby. Appellant's friend asked if police were searching for him and Tello; appellant denied it and did not say he had to defend himself from an attack.

While incarcerated, appellant spoke to Tello daily and she visited in person. He called her from jail 1,087 times; she always accepted his calls. He told her he was " 'hooked' " on her and said, " 'You're mine' " when she tried to break up with him. He agreed that he sounded "aggressive" and "angry" when he spoke to Tello from jail just before trial, knowing she was a key witness.

## PROCEDURAL HISTORY

Appellant was charged with murder, with a knife use enhancement. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).) Tello was granted immunity to testify. Trial was held from August to October 2023. After three hours of deliberation, the

16

jury convicted appellant of first degree murder and found true that he used a knife.

Appellant moved for a new trial, arguing that the evidence did not prove premeditation or that his attack on Castellanos was unprovoked; his threatening calls to Tello should have been excluded; and evidence should have been admitted from which jurors might infer that the victim was a gang member who claimed the location of the murder as his turf.

Appellant asked for less than the maximum sentence, owing to his youth and lack of prior felony convictions. The court denied a new trial and sentenced him to prison for 26 years to life.

## DISCUSSION

### 1. Evidence of Premeditation

Appellant challenges the sufficiency of the evidence supporting the jury's finding of premeditation. " '[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt,' " and presume the existence of every fact that can reasonably be deduced from the evidence in support of the judgment. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *People v. Pride* (1992) 3 Cal.4th 195, 247 [verdict is upheld "if a rational trier of fact could find premeditation and deliberation beyond a reasonable doubt."].)

Premeditation is commonly shown by evidence of planning, motive, and manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Other types of evidence may also show premeditation and deliberation. (*People v. Solomon* (2010) 49

17

Cal.4th 792, 812.) The test is not how long the defendant deliberated because " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*Id.* at p. 813.) "[P]remeditation can occur in a very brief period of time." (*People v. Miranda* (1987) 44 Cal.3d 57, 87; *People v. Disa* (2016) 1 Cal.App.5th 654, 666 [a rational jury could find that defendant rapidly premeditated a killing while holding the victim in a carotid restraint, which can kill within one minute].)

Appellant does not challenge the jury's finding that he intended to kill. The record supports the jury's finding that he acted with premeditation and "decided to kill before completing the acts that caused death." (CALCRIM No. 521.)

Appellant knew that Tello corresponded with Castellanos on Instagram in July 2022; appellant testified that he was angered by the flirtatious messages. Tello said appellant was jealous and possessive. She complained to a friend that appellant was tracking her using the phone locator and was stalking her by hanging out outside her home. On the night of August 10, she broke up with appellant, then changed her Instagram password so he could not see if she was communicating with other men.

The jury could infer that appellant saw on his phone locator that Tello left home at 1:00 a.m. on August 11, hours after ending their relationship. He sent messages demanding to know where she was and called her. She did not reply. He jumped in his truck and drove to Maravilla, entering a parking lot that is far from Tello's home but near the playground. Surveillance recordings show, and appellant agreed, that he turned off his headlights before pulling into the lot. The jury could reasonably find that appellant sought to confirm his suspicion that Tello left

18

home to meet someone on the playground, planned to surprise them, and did not want to be detected beforehand.

Tello testified that appellant did not carry a knife and did not fear or have problems with anyone at Maravilla. Appellant testified that the knife never left the truck. (See fn. 2, *ante*.) However, he armed himself on August 11. The jury could find that he removed the knife from his truck with the intent to kill any romantic rival he might find with Tello.

"[E]vidence that defendant arrived . . . carrying a weapon suggests that the murders were planned," when testimony showed he did not carry the weapon routinely. (*People v. Potts* (2019) 6 Cal.5th 1012, 1027–1028.) Appellant concedes that the act of arming himself prior to a killing is evidence of planning, citing *People v. Miranda, supra,* 44 Cal.3d at p. 87 [bringing a weapon "and shortly thereafter us[ing] it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"].)

Surveillance recordings showed appellant walking hurriedly, while looking at his phone, to the precise location where Tello was sitting with Castellanos. The jury could find that appellant used the locator to quickly find and attack Castellanos, instead of going directly to Tello's home to discuss their relationship, as he claimed.

Within seconds of finding Tello, appellant made physical contact by pushing Castellanos, who stepped back, away from appellant. Appellant then attacked Castellanos by releasing the blade on the knife, stabbing him 11 times all over his body, including the back of the head. The number of deep stab wounds alone indicates that appellant brought his weapon with the intent to kill, not for defensive use. Once he discovered Castellanos

with Tello, appellant did not simply tell him to leave, but unleashed a fatal frenzy of stabs in 27 seconds on the unarmed, unsuspecting teen. "A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation." (*People v. Pride, supra,* 3 Cal.4th at p. 247.)

Appellant's motive to kill may be deduced from his jealous, possessive attitude toward Tello. (See *People v. Powell* (2018) 5 Cal.5th 921, 945–946 [motive was shown by defendant's obsession with his girlfriend, fear she might be seeing other men, his uninvited appearances, and rage when she made social plans with a man].) Appellant rejected Tello's efforts to break up. He testified that he needed Tello and wanted to be with her forever. He monitored her movements and telephone, and stalked her; the jury could deduce that appellant would do anything to prevent Tello from meeting other men.

Appellant concedes that "many killings have occurred in the context of romantic rivalry," but claims that the person he found with Tello was just "some guy," and he did not know if it was one of the young men she communicated with on Instagram. Tello was in a secluded area of a playground, in her pajamas, with a man, at 1:00 a.m. As appellant notes, he told a friend, "I just don't want her to fuck anyone [else]." His unsureness of the identity of the person with Tello does not defeat his motive to kill any rival for his affections.

Appellant expressed obsession with Tello in jailhouse calls, when he said, "That pussy is mine. . . . You're mine." When Tello protested that they were no longer a couple, he threatened to go to her home "first thing when I get out" and sexually assault her to the point that she would have to be hospitalized. He told her (and a friend in a jailhouse call) that if they were not together, he

did not want her to be with anyone else. To this end, he killed a potential rival.

In sum, substantial evidence supports a finding of premeditation. Appellant realized that his girlfriend might be cheating on him. He made plans to attack his rival, drove 14 miles to where his girlfriend was meeting the rival, took a knife, and repeatedly stabbed the victim in the torso to ensure his death. These activities met the factors listed in *People v. Anderson, supra,* 70 Cal.2d at pp. 26–27.)

## 2. Evidence of the Victim's Propensity for Violence

The prosecution moved to exclude photos of Castellano, in a group, throwing a gang sign and holding a real or replica gun, arguing that it did not show violent behavior. If the court allowed it, the prosecution intended to produce evidence of the victim's nonviolent nature, and also show that appellant recently stabbed a jail inmate 20 times with a shank. Defense counsel told the court he did not intend to introduce the evidence unless a witness opened the door by saying that the victim has never done anything or never had any contact with firearms.

As the case unfolded, the victim's mother testified that her son attended school, liked sports, hung out at the playground next to their home, and did not have problems with the locals. The court overruled a defense objection that this testimony showed the victim's good character. In closing argument, the defense tried to show a photo of graffiti with the name that the victim used for his Instagram account; he planned to argue that Castellanos challenged appellant on his turf. The court said, "There is no evidence of that, and I'm not going to allow it."

On appeal, appellant contends that excluding evidence from which jurors might have inferred that Castellanos was a

21

gang member "went to the heart of [his] defense that Castellanos was the aggressor." The court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion. (*People v. Sanchez* (2016) 63 Cal.4th 411, 456.) A ruling that is arbitrary, capricious or absurd and results in a manifest miscarriage of justice is an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

The court did not abuse its discretion. There was no evidence that Castellanos tagged graffiti, was a gang member, or had a gang-related criminal record. The only tattoos he had were the names of his father and aunt.

Defense counsel admitted, "I'm not saying he's a gang member. But I have a right to have the jury draw inferences." Appellant wanted the jury to presume Castellanos was a gang member because, as stated in his brief, he was "a young Hispanic." This is not a permissible inference. Further, the probative value of the evidence was substantially outweighed by the danger of undue prejudice or misleading the jury. (Evid. Code, § 352.) Nothing in the record suggests that this was a fight over turf; the evidence only shows that the victim flirted with appellant's girlfriend and was killed for doing so. Moreover, it would "necessitate undue consumption of time" (*ibid.*) to prove to the jury that other individuals in the group photo with Castellanos are actual gangsters.

### 3. Evidence of Appellant's Jailhouse Call

Appellant moved to limit use of his recorded jailhouse call, arguing that it should not be used to demonstrate his character for violence, untruthfulness, or propensity to commit the charged murder. The prosecutor sought to use the call to impeach Tello's claim on the witness stand that appellant was not jealous or

threatening, and she did not fear him.  The call demonstrated jealousy and possessiveness toward Tello, and his fear-inducing threats to her.  The court indicated that its ruling would depend on whether Tello's testimony was affected by her fear of appellant; further, statements showing appellant's obsession with Tello could establish motive.

At trial, Tello repeatedly answered, "I don't remember," "I don't know," and "I'm not sure" to questions about the slaying and events leading up to it.  She claimed to be "honest and truthful" with homicide detectives, but her testimony contradicted her interviews.  The court found "by substantial evidence that her memory lapses for the most part are not true."  It allowed the prosecution to play appellant's call.

The prosecutor's impeachment strategy succeeded.  When appellant's words were played in court, Tello became emotional and admitted that her testimony about being unafraid of appellant was untrue:  She fears appellant because she saw him kill someone and thought, "it could have been me."  Upon admitting her fear of appellant, Tello stated that appellant is possessive, jealous, and controlling.  She had denied her fears earlier "[b]ecause I was scared" that appellant would come home in two weeks (as he promised in his call) and hurt her.  She feared that hanging up on him would make him angrier.

The court did not abuse its discretion by admitting appellant's call.  The sole eyewitness was evasive and claimed memory lapses, which disappeared when she was confronted with appellant's threats to beat and sexually abuse her.  She admitted that she was afraid to testify.  Contrary to appellant's claim, his threats made the day before trial began were *not* "meant to convey to Tello that appellant missed her."

23

A jury may consider any matter tending to prove or disprove witness truthfulness.  (Evid. Code, § 780.)  "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court."  (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*).)  A witness who testifies despite fear arising from threats " 'is more credible because of his or her personal stake in the testimony' " and " 'the jury would be entitled to evaluate the witness's testimony knowing it was given under such circumstances.' "  (*People v. Merriman* (2014) 60 Cal.4th 1, 86.)

In *Burgener*, a witness explained that her "inability to recall certain details" in prior testimony occurred because "she had been afraid to tell the truth . . . because of threats made against her and her children" conveyed to her by Burgener's former jail mate, who could not be cross-examined because he had died.  (*Burgener, supra*, 29 Cal.4th at pp. 868–869; see also *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773 [allowing threats to a witness and his family]; *People v. Flinner* (2020) 10 Cal.5th 686, 719, 723–724 [admitting a witness's letter to an trial investigator saying " 'I'm seriously concerned for my family's safety' " for failing to assist the jailed defendant because it showed her fear of testifying].)

Evidence reflecting on Tello's credibility—her inconsistent and evasive testimony, and explanation for it—is even stronger here than in *Burgener, supra,* 29 Cal.4th 833. Burgener indirectly threatened a witness, while in this case there is direct evidence from appellant himself.  Tello could properly explain how

24

appellant's angry words frightened her and caused her to omit important information in her answers or claim no memory while being questioned on the stand. The jury was entitled to weigh this when assessing her testimony.

In addition, the jailhouse call was admissible to prove motive. The prosecution's theory was that appellant's obsession with Tello and jealousy motivated him to kill a romantic rival. The jailhouse call demonstrated obsession, with appellant insisting that Tello was his wife when she denied that they were a couple. Wide latitude is given to the admission of evidence of motive. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.)

### 4. Harmless Error

A verdict, finding or judgment cannot be reversed by reason of the erroneous admission or exclusion of evidence unless appellant shows that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, §§ 353, 354.) Even if there was evidentiary error in appellant's case, the totality of the record shows no prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The evidence supporting the verdict is overwhelming.

Appellant admitted at trial that he stabbed the victim 11 times. He took a switchblade from his car, hurried to where Castellanos was chatting with appellant's girlfriend, and stabbed him repeatedly in a matter of seconds. Castellanos was unarmed.

Tello witnessed the crime. She testified that Castellanos said "what's up?" in a way that showed confusion, not aggression. She had not warned him of the jealous, possessive boyfriend who stalked her. Castellanos could not have known that the angry boyfriend would show up in a playground at 1:00 a.m., or that the location finder on Tello's phone would lead appellant to her.

Tello stated that appellant attacked Castellanos, who did not utter any threats and was not in appellant's personal space. She did not see appellant in a chokehold, and he had no marks, scratches or bruises consistent with a fistfight or chokehold. The jury could infer that any scratches on appellant's knees came about when he knelt and stabbed Castellanos, who was on the ground, according to Tello.

Appellant's claim of self-defense lacked credibility. His courtroom demonstration of hunching forward while in a chokehold was belied by stab wounds to the victim's abdomen, back, and back of his neck and skull. Appellant could not reach those areas while stabbing backward over his shoulder. The medical examiner described defensive wounds to Castellanos's arms as he tried to fend off the attack. Appellant claimed he had no idea whether his knife entered Castellanos, but the stab wounds were forceful and deep, puncturing the victim's lung, eviscerating him, and chipping his skull. Surveillance recordings show that appellant arrived at the playground at 1:21 a.m., and the victim walked toward the basketball court a minute later. There was no time for a verbal confrontation or a chokehold.

After the stabbing, appellant's actions were inconsistent with self-defense. He did not call 911 to report that he was attacked. He forced Tello to leave with him, though she wanted to go home, and forced her to reset her telephone to erase his incriminating messages. He did not approach deputies who were scouring the scene the following day. He got rid of the knife, bloody clothing, and cleaned his car. His mother effectively kidnapped the eyewitness to prevent her from talking to police. He threatened to beat and assault Tello just before trial, to frighten her into lying about what she saw on August 11.

Appellant's behavior was consistent with a premeditated murder. There is no basis for reversal.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.

27